UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SELIM UMIT KUCUK,

                Plaintiff,

    v.

CENTRAL WASHINGTON UNIVERSITY,

                Defendant.

CASE NO. 2:17-cv-01262-BAT

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Central Washington University ("CWU") seeks summary judgment, pursuant to Fed. R. Civ. P. 56, on Plaintiff Selim Umit Kucuk's sole claim of disparate impact. Dkt. 36. For the reasons explained herein, Defendant's motion is granted and Plaintiff's claim is dismissed with prejudice.

**PROCEDURAL HISTORY**

In his original complaint, filed on August 21, 2017, Dr. Kucuk alleged disparate treatment, disparate impact, and retaliation in CWU's hiring practices from 2011 to 2015. Dkt. 1. On October 4, 2017, CWU moved to dismiss for failure to state a claim. Dkt. 7. On November 30, 2017, the Court dismissed Dr. Kucuk's disparate treatment claim with prejudice and without leave to amend, but granted leave to amend the disparate impact and retaliation claims. Dkt. 17.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 1

The Court also found that the disparate impact claim would be timely only as to a 2015 tenure-track marketing position. Dkt. 17, p. 4.

Dr. Kucuk amended his complaint on December 18, 2017. Dkt. 19. CWU again moved to dismiss for failure to state a claim. Dkt. 20. On March 30, 2018, the Court dismissed Dr. Kucuck's retaliation claim with prejudice and his state law claims without prejudice, and denied further leave to amend. Dkt. 24. The Court denied CWU's motion to dismiss the disparate impact claim (*id.*, p. 8) – the claim now at issue.

## STATEMENT OF FACTS

Dr. Kucuk is Turkish-American and a naturalized citizen of the United States. Dkt. 19, ¶¶ 11, 18. He is a former CWU employee who worked as a full-time faculty member from 2009 to 2011. *Id.*, ¶ 18. Dr. Kucuk received his Ph.D. from Hacettepe University in Turkey in 2001. *Id.*, ¶ 19.

In 2015, Dr. Kucuk applied for a tenure-track marketing professor position at CWU's satellite campus in Des Moines. Dkt. 19, ¶ 33. CWU denied Dr. Kucuk's application because his Ph.D. is not from a university accredited by the Association to Advance Collegiate Schools of Business ("AACSB"). Dkt. 37, Declaration of Kathryn Martell, Dean of CWU College of Business, ¶ 35. Since 2005, CWU has required all tenure-track applicants to hold a Ph.D. from an AACSB-accredited program (the "accreditation requirement"). Faculty who were tenured prior to that date (with Ph.Ds from non-accredited universities) were "grandfathered in." *Id.*, ¶ 11.[1]

---

[1] Dr. Kucuk argues it is unclear when the accreditation requirement was instituted as a May 25, 2011 letter from CWU's Office for Equal Opportunity indicates it was ten to twelve years prior to 2011 (Dkt. 40, Exh. III, p. 3), while Dr. Martell's testimony is that it was in 2005. The question is not material to this dispute, however, as it is undisputed that the accreditation requirement has applied since 2005 and that it applied to the 2015 position.

Dr. Kucuk filed an EEOC discrimination claim against CWU. *Id.*, ¶¶ 15, 36. His 2015 charge led to the current action, filed on August 21, 2017 (Dkt. 1), after the EEOC issued his May 24, 2017, "right to sue" letter (*see* Dkt. 19, ¶ 16; Dkt. 3, Ex. 10 at 2); *see also* 42 U.S.C. § 2000e-5(f)(1).

CWU's College of Business began its effort to become accredited by the AACSB in 1994. Dkt. 37, Martell Decl., ¶ 5. After a lengthy and expensive process, CWU achieved full accreditation in 2010. *Id.* CWU has paid AACSB a total of $157,350 since 2001 for its yearly dues and fees, and spent countless other resources in staff and faculty time to achieve accreditation. *Id.*, ¶ 16. According to Dean Martell, these costs are well spent as they allow CWU to remain competitive with other four-year universities in the state. *Id.*, ¶ 17.

The AACSB considers fifteen different rigorous standards, which include faculty sufficiency, qualifications, and engagement, when it accredits a business school. Dkt. 37, Martell Decl. ¶ 7. In 2003, the AACSB changed its standards to be very specific about the qualifications and credentials of university faculty for accreditation. *Id.*, ¶ 6. This includes, among other things, that all tenure-track faculty hold a Ph.D. *Id.*, ¶ 8. During a 2004 Mock Peer Review, part of the process to attain accreditation, the review team identified problems with the "[s]ufficiency of the academic qualifications of the faculty across all majors and locations." *Id.*, ¶ 8, Ex. 2. In response, the College of Business developed a hiring policy, implemented in 2005, requiring that all newly hired tenure-track faculty hold a Ph.D. from an AACSB-accredited university. *Id.*, ¶¶ 9, 11. Doing so ensured that all incoming faculty would meet or exceed the AACSB's academic requirements for faculty. *Id.*, ¶ 9.

While the AACSB does not expressly state that all College of Business faculty must hold a Ph.D. from an AACSB-accredited university, many universities, like CWU, have developed

hiring policies that require tenure and tenure-track hires to hold terminate degrees from AACSB-accredited universities. Dkt. 37, Martell Decl. ¶ 10. For example, of the 21 marketing professor positions in the United States advertised on the AACSB career page (as of September 12, 2012), 12 included the accreditation requirement. *Id.*, Exh. 3.

According to Dean Martell, the accreditation requirement has not had an adverse impact on the diversity of CWU's business faculty, and in fact, the AACSB includes diversity as one of its factors in accreditation. Dkt. 37, Martell Decl. ¶ 13, Exh. 4. In 2005, CWU provided documentation to the AACSB showing recent hires from Australia, Jordan, South Africa, South Korea, Taiwan, and Turkey. While CWU does not officially track the national origin of its faculty, Dean Martell is personally aware that the last three years' hires in the College of Business are from Poland, Italy, South Korea, and Romania. *Id.*, ¶ 14.

When Dr. Kucuk applied for the 2015 tenure-track marketing professor position, there were sixty-nine other applicants. Dkt. 37, Martell Decl., ¶ 21, Exh. 6. CWU did not consider applicants without a Ph.D. from an AACSB-accredited institution and therefore, Dr. Kucuk was not considered for the position. *Id.*, ¶¶ 21-22. Dr. Kucuk's Ph.D. is from Hacettepe University, which has not pursued AACSB accreditation. *Id.* This has nothing to do with the fact that Hacettepe University is located in Turkey. There are three AACSB-accredited universities in Turkey: Bilkent University, Istanbul University, and Sabanci University. *Id.*

Dr. Claudia Dumitrescu, a Romanian national, was selected for the position sought by Dr. Kucuk. Dkt. 37, Martell Decl. ¶ 23. Dr. Dumitrescu's Ph.D. in Business Administration is from the W.P. Carey School of Business, Arizona State University, which has maintained its AACSB accreditation for more than fifty years. *Id.*, ¶ 23. Dr. Dumitrescu previously taught at Whitworth

University School of Business as an assistant professor of marketing, and at Arizona State University. *Id.*, ¶ 23, Ex. 7.

The tenure-track position sought by Dr. Kucuk was the only tenure-track position open and filled between August 1, 2015 and January 28, 2016. Dkt. 37, Martell Decl., ¶ 24.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e).

Because pro se plaintiffs do not have the benefit of legal counsel, their initial pleadings are "held to less stringent standards" than those drafted by lawyers. *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 923 n. 4 (9th Cir.2011), *cert. denied*, ––– U.S. ––––, 132 S.Ct. 1000, 181 L.Ed.2d 743 (2012). At summary judgment, however, "[t]he elements plaintiff must prove, and plaintiff's burden of proof, are not relaxed simply because [he] is appearing pro se." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir.1986)); *see also Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir.2010) ("an ordinary pro se litigant, like other litigants, must comply strictly with the summary judgment rules").

# DISCUSSION

**A.      Timing of Summary Judgment / Need for Discovery**

Dr. Kucuk suggests that CWU improperly filed its summary judgment motion before he was able to complete discovery. Dkt. 40, pp. 3-4. A party may file a motion for summary judgment "at any time until 30 days after the close of all discovery." Fed. R. Civ. Proc. 56(b). Pursuant to the Court's Scheduling Order, the deadline for discovery motions was September 28, 2018, and discovery was to be completed by October 12, 2018. Dkt. 32; *see also* Dkt. 35. CWU's motion for summary judgment was noted for November 2, 2018. Dkt. 36. Thus, there was nothing improper about the timing of CWU's summary judgment motion.

The Court also finds that Dr. Kucuck has not shown there is any discovery necessary to establish his case. In a "Notice/Response" to the Court's Scheduling Order filed on September 28, 2018, Dr. Kucuk suggested he should not be held to the discovery deadline because he is a pro se litigant. Dkt. 34. The Court reminded Dr. Kucuck that his pro se status does not relieve him of his obligation to comply with federal and local court rules and court orders, notwithstanding the Court's obligation to make reasonable allowances for pro se litigants. Dkt. 35, p. 1 (citing *McCabe v. Arave*, 827 F.2d 634, 640 n. 6 (9th Cir.1997)). The Court also explained that if Dr. Kucuck needed more time for discovery, he should file a motion explaining what he needed, why he needed the additional time, and why he could not obtain the information from Defendant. Dkt. 35, p. 2. Mr. Kucuck never filed a motion seeking additional time nor did he file a motion to compel discovery.

More importantly, Dr. Kucuck does not describe now what evidence or discovery exists that would enable him to establish his case. He alleges in conclusory fashion that CWU has kept discovery from him, but he fails to describe the nature of this discovery or explain how it will

help him to defeat CWU's summary judgment motion. While Rule 56(d) allows the Court to defer considering CWU's motion to allow time for additional discovery, Mr. Kucuck has not shown, as is required, by affidavit or declaration that for specified reasons, he cannot present facts essential to justify his opposition. CWU's motion for summary judgment is neither untimely nor does Mr. Kucuck present grounds to delay the Court's consideration of the motion.

**B.        Accreditation Discrimination**

Mr. Kucuck argues that CWU need not and should not have an accreditation requirement at all. *See*, *e.g.*, Dkt. 40, pp. 5-9 (citing Exhibit II) ("AACSB accreditation does not specify that faculty must have graduated from AACSB accredited institutions."); ("Dean Savion['s belief] that the school should hire candidates with a PhD from AACSB-accredited schools [] is NOT AACSB's official hiring standard.") ("…there was NO indication that AACSB … asked them to implement this discriminatory hiring standard….defendant pretended that the school can lose its accreditation if they don't hire candidates with a PhD from AACSB-accredited schools while that was NOT the case.")

Courts have held that an accreditation requirement is not discrimination. *Pouyeh v. UAB Dep't of Ophthalmology*, 625 Fed. Appx. 495, 497 (11th Cir. 2015), *cert. denied sub nom. Pouyeh v. Bd. of Trustees of the Univ. of Alabama*, 136 S. Ct. 840, 193 L. Ed. 2d 745 (2016). In *Pouyeh*, plaintiffs alleged that the defendant had systematically denied Iranian doctors from residency positions by requiring applicants to have graduated from a medical school accredited by either the American Medical Association or the Canadian Medical Association. *Id*. at 495. The *Pouyeh* Court determined that rejecting applicants on the basis of whether the school they attended was accredited is not discrimination based on national origin. *Id*. at 497 (citing *Maceluch v. Wysong*, 680 F.2d 1062, 1065 (5th Cir. 1982) (explaining that a policy "based on

the locality of the education received" does not discriminate based on alienage because "[s]ubstantial numbers of Americans attend medical schools abroad, just as some foreigners attend medical schools in the United States").

Thus, having a facially-neutral accreditation requirement is not discrimination, as a matter of law. More importantly, whether CWU *should* have an accreditation requirement is not at issue here. Dr. Kucuk's sole cause of action is whether application of CWU's accreditation requirement to the 2015 tenure-track position resulted in a disparate impact on the basis of national origin.

**C.      Expert Reports Are Inadmissible Hearsay**

Dr. Kucuk provided expert reports from Dr. Thomas M. Tripp and Dr. Donovan McFarlane. Dkt. 40, Exhibits V and VI, respectively. CWU objects to the reports on the grounds that they are inadmissible because they are unauthenticated.

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Authentication is a condition precedent to admissibility. *Id*. Neither Dr. Tripp nor Dr. McFarlane signed their reports under penalty of perjury, as required by Fed. R. Civ. P. 56(c) and 28 U.S.C. § 1746. Nor did they swear in a declaration that they would testify in accordance with their reports, which would satisfy the functional concerns behind Rule 56(c)(4), *i.e.*, that they are competent to testify to the conclusions and opinions contained in their reports. *See*, *e.g.*, *American Federation of Musicians of United States and Canada v. Paramount Pictures Corporation*, 903 F.3d 968, 976 (9th Cir. 2018). Because the reports are not authenticated, they are inadmissible pursuant to Fed. R. Evid. 801. The reports are hearsay and Dr. Kucuk provides no exception to this rule. Thus, the

reports are excluded. Nevertheless, the Court also notes that the reports are not probative of disparate impact.

Dr. Tripp merely opines that Dr. Kucuk is academically qualified for a tenure-track position at CWU. Dr. Tripp does not examine the qualifications of the entire pool of applicants and therefore, his report is not probative of whether any disparate impact occurred under the facts of this case. Similarly, Dr. Donovan's report provides no relevant evidence to the critical question of disparate impact as he merely argues that having an accreditation requirement may lead to "accreditation discrimination."

**D.      Disparate Impact Claim**

A disparate impact theory, "involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Broth. of Teamsters v. U.S.*, 431 U.S. 324, 335 n.15 (1977); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S. Ct. 849 (1971). Dr. Kucuk must show "that a facially neutral employment practice has a 'significantly discriminatory' impact upon a group protected by Title VII." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 481 (9th Cir.1983); *see also Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645–46, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k). This showing consists of two parts: 1) a specific employment practice that 2) causes a significant discriminatory impact. *Wards Cove Packing Co.*, 490 U.S. at 656–67, 109 S.Ct. 2115; *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

Statistical evidence is used to demonstrate how a particular employment practice causes a protected minority group to be under represented in a specific area of employment (for example,

hiring or promotion). *See Watson*, 487 U.S. at 994, 108 S.Ct. 2777. The statistical analysis must show a disparity that is "sufficiently substantial" as to "raise such an inference of causation." *Id*. at 995, 108 S.Ct. 2777. A plaintiff need not prove discrimination with "scientific certainty"; he must, however, prove any such charge by a preponderance of the evidence. *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship and Training Comm.*, 833 F.2d 1334, 1338 (9th Cir.1987) (quoting *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)).

Once the plaintiff has made a *prima facie* showing of disparate impact, the burden then shifts to the defendant to either challenge plaintiff's statistical evidence by discrediting it or presenting contradictory evidence, *see Watson*, 487 U.S. at 996, or to justify its practice by showing a "manifest relationship to the employment in question." *Griggs*, *supra*; *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S. Ct. 2362 (1975) (quoting *Griggs*). If defendant shows such a justification, plaintiff must then demonstrate, "that other tests or selection devices, without a similarly undesirable [discriminatory] effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship." *Albermarle Paper*, *supra* (citing *McDonnell Douglas*, 411 U.S. at 802).

1. **Specific Employment Practice**

The parties agree that CWU's accreditation requirement satisfies the first element of a *prima facie* case of disparate impact, *i.e.*, a specific facially neutral employment practice. Dkt. 19, at ¶¶ 49, 50; Dkt. 36, p. 6.

2. **Actual Proof of Disparate Impact**

Disparate impact cases require actual proof of a disparate impact on "a protected group." *Pouyeh*, 625 Fed. Appx. at 497; *see also Moore*, 708 F.2d at 481. To show disparate impact, Dr.

Kucuk must provide statistical evidence (or its equivalent) to demonstrate how the accreditation requirement causes a disparate impact on his protected group. *Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002). The statistical analysis must show a disparity that is sufficiently substantial as to raise an inference of causation, and this requires some ability to compare the group that enters the process with the group that emerges from it. *Id*. In other words, the statistical analysis must be based on the proper comparative group. *Id*. at 1147; *see also Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1184-85 (9th Cir. 2002).

There must be some point of reference to determine or infer whether the challenged employment practice is in fact, causally related to any disparity in representation. For example in *Moore*, where the evidence of statistical disparity was the absence of black females in higher labor grades as compared to lower labor grades, the Ninth Circuit held the evidence was insufficient to support an inference of discrimination because there must be some evidence that the black females in the lower labor grades were also qualified for the higher labor grades. *Moore*, 708 F.2d at 484. Similarly, in *Wards Cove*, where plaintiff's evidence consisted of comparisons between the percentages of black and white employees in lower and higher wage positions, the Supreme Court determined this was insufficient because it failed to show that the employees in the lower wage positions were qualified for the higher wage positions. *Wards Cove*, 490 U.S. at 650. Instead, what was required was a comparison between the percentage of qualified black persons in the labor market and the percentage of black persons hired to the higher wage positions *and* a causal link to the employment practices. Anything less could result in an employer's liability for "the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces." *Id*. at 657 (quoting *Watson*, 487 U.S. at 992)).

Dr. Kucuk alleges that only 11% of CWU's business faculty is of international origin, compared to 31% of faculty in American Universities. Dkt. 40, pp. 16-17. However, this allegation is unsupported and is not admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Moreover, even if true, the allegation does not demonstrate how the accreditation requirement has had a disparate impact on persons of international origin at CWU.

Dr. Kucuk contends that disparate impact is shown here as six candidates with international degrees were not considered for the 2015 position because they did not meet the accreditation requirement. Dkt. 40, pp. 11-12 (citing Exhibit 7). Dr. Kucuk assumes that the six candidates are of international origin presumably because they obtained their Ph.Ds from universities outside the United States. Dkt. 40, p. 11. Dr. Kucuk has provided no competent summary judgment evidence on which the Court may make the same assumption. Just as there are individuals of international origin (like Dr. Dumitrescu), who obtained their degrees from American universities, there are Americans who obtain their degrees from international universities. It is also not disputed that there are international universities with AACSB accreditation. In fact, three universities in Turkey have obtained the accreditation. *See*, *e.g.*, Dkt. 37, Martell Decl., ¶ 22 (Bilkent, Istanbul, and Sabanci Universities).

Out of sixty-nine applicants, thirteen met the accreditation requirement (Dkt. 37, Martell Decl., Exh. 6), yet there is no comparison between the entire pool of sixty-nine applicants who applied and the thirteen who met the accreditation requirement. There is no evidence to show how many in the entire pool of applicants held international degrees or were of international origin and were considered. Ultimately, even if Dr. Kucuk had done such a comparison, he would be unable to show that the accreditation requirement prevented international candidates from this tenure-track position because a Romanian national was selected. Dr. Kucuck does not

address this fact. Instead, he argues that CWU hired Ronald D. Elkins, who is "an American born Caucasian," for an assistant professor position despite the fact that he does not have a doctoral degree from an AACSB-accredited institution (Dkt. 19, ¶ 29) and that CWU hired Terry Wilson, an American-born Caucasian, for the 2015 tenure-track position (*id.*, ¶ 27).[2] Neither of these individuals was a contender for the 2015 tenure track position sought by Dr. Kucuk and therefore, these allegations are neither relevant nor probative of whether CWU's accreditation requirement resulted in a disparate impact on national origin.

To be relevant and probative, Dr. Kucuk must provide a comparison of the entire pool of sixty-nine candidates, such as how many held accredited degrees that were considered and how many were of international origin, but he has failed to do so. Based on the summary judgment evidence provided, the accreditation requirement does not have an adverse effect on international faculty seeking tenure-track positions at CWU's College of Business.

On the other hand, available summary judgment evidence suggests that the accreditation requirement is not having an adverse effect on foreign nationals seeking employment with CWU's College of Business. Dean Martell testified that since the 2005 accreditation requirement was adopted, new hires included individuals from Australia, Jordan, South Africa, South Korea, Taiwan, Turkey, Poland, Italy, South Korea, and Romania. Dkt. 37, Martell Decl., ¶ ¶13-14, Exh. 4; Dkt. 38, Sleigh-Layman Decl., ¶¶ 4-5. The evidence also shows that CWU hires many

---

[2] Mr. Elkins, who holds a Master of Science, was hired in 1995 as an assistant professor in Economics, a non-tenure-track position, and Mr. Elkins was "non-renewed" in 2017. Dkt. 42, Dkt. 42, Declaration of Charlene Andrews, CWU Coordinator of Faculty Relations, ¶ 3. Dr. Wilson was hired in a non-tenure-track position in 2009 while she was finishing her Ph.D. She obtained her Ph.D. in June 2011, in Business Administration from the Foster School of Business, University of Washington, which is accredited by AACSB International. Dr. Wilson was hired to a tenure-track assistant professor of marketing position in June 2011, and was granted tenure and promoted to associate professor in 2018. Dr. Wilson served on the hiring committee for the 2015 marketing position sought by Dr. Kucuck. *Id*., ¶ 4.

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 13

people with an international background, provides assistance with visas, and sponsors residency applications for its international faculty following tenure. Dkt. 38, Sleigh-Layman Decl. ¶¶ 7-8. CWU's College of Business also has a tenured faculty member who is a Turkish national, Dr. Ozden Bayazit. *Id.* Dr. Bayazit, who was hired in 2003, holds a degree from a non-accredited institution, but because he was tenured faculty prior to institution of the accreditation requirement in 2005, he was "grandfathered in." Dkt. 40, p. 19; Dkt. 37, Martell Decl., ¶ 11. Dr. Kucuk provides no evidence of any tenure-track faculty hired by the College of Business after 2005 who does not hold a degree from an AACSB-accredited institution.

Because Dr. Kucuk has failed to provide statistical evidence or its equivalent to demonstrate how the accreditation requirement causes a disparate impact on his protected group, CWU is entitled to summary judgment on his disparate impact claim.

**D.     The Ph.D. Requirement Bears a Manifest Relationship to a Business Necessity**

CWU also argues that its accreditation requirement "is job related for the position in question and consistent with business necessity." *See*, *e.g.*, 42 U.S.C.A. § 2000e-2(k)(1)(A)(i) (disparate impact is established when the plaintiff demonstrates that an employment practice has a disparate impact and the respondent fails to demonstrate that the challenged practice is job related and consistent with business necessity); *Merwine v. Bd. of Trustees for State Inst. of Higher Learning*, 754 F.2d 631, 639 (5th Cir. 1985). The Court need not reach this issue because it dismisses Dr. Kucuk's disparate impact claim for failure to show that the accreditation requirement has a disparate impact. The Court notes, however, that CWU has provided evidence that its accreditation requirements is consistent with business necessity. For example, by hiring only tenure-track candidates who meet the accreditation requirement, CWU satisfies AACSB's requirements regarding qualified faculty, ensures that CWU is only considering qualified

candidates for its tenured faculty positions, and acquires candidates already familiar with the standards required to maintain AACSB accreditation and who are already engaged in and ready to pursue further research. *See* Dkt. 37, Martell Decl., ¶ 18. AACSB-accreditation is vital to the College of Business's ability to remain competitive with other four-year universities in the state, and by hiring candidates from accredited institutions, CWU is assured the candidates have been educated at a rigorous institution and can provide the same rigorous education to students at CWU. *Id.*, ¶¶ 17, 7, 8.

Thus, CWU has provided evidence that its accreditation requirement is related to its tenure-track faculty position and is consistent with various business necessities. Dr. Kucuk has provided no competent evidence to the contrary.

**E.     No Feasible Alternative to Accreditation Requirement**

Once an employer has shown their employment practice bears a manifest relationship to the position at issue, a plaintiff still may show that another employment practice that lacks any discriminatory effect would satisfy the employer's business interest, but that the employer refuses to adopt that alternative employment process. 42 U.S.C.A. § 2000e-2(k)(1)(A)(ii). Without such a showing, the employer is lawfully entitled to use even a practice that has been shown to have a disparate impact on a protected group. *Lamphere v. Brown Univ.*, 875 F.2d 916, 919 (1st Cir. 1989) (citations omitted).

Dean Martell testified that, if CWU could not rely on AACSB accreditation, the hiring process would lengthen considerably and become more complicated. Dkt. 37, Martell Decl., ¶ 19. In response, Dr. Kucuk "guess[es] a couple of hours staff-hour or two-page extra paperwork costs" would be involved. Dkt. 40 at 13. According to Dean Martell, however, CWU would essentially have to duplicate the work that AACSB already does (without the internal access

afforded to AACSB), for every tenure-track hire, *i.e.*, research every school, review its mission statement, and gather hard indicators on the quality of faculty, support, services, interaction between faculty and students, and interaction between students and students. Dkt. 37, Martell Decl., ¶ 19. Even if this only involved a handful of schools, it would be a time-consuming and onerous burden as it would compound with the faculty and staff time already devoted to maintaining accreditation and would greatly complicate CWU's hiring process. *Id.* With regard to the 2015 tenure-track position, CWU was able to rely on the accreditation requirement to objectively reduce the pool of applicants for consideration from sixty-nine to thirteen. Dkt. 37, Martell Decl. ¶ 21, Exh. 6. Thus, without the benefit of the accreditation requirement, CWU staff would have had to research sixty-nine applicants to determine if they would be considered academically qualified by the AACSB. This would result in a timely and costly burden to CWU. Without the accreditation requirement, the process would also be left to the subjective and potentially biased discretion of the reviewer (who may have little to no familiarity with international schools); whereas CWU can currently rely on the objective standards established by the AACSB to maintain quality control for its tenure-track faculty. *See*, *id.*, ¶ 20.

Dr. Kucuk's "guess" that elimination of the accreditation requirement would not increase CWU's administrative costs is not sufficient evidence to show that another employment practice that lacks any discriminatory effect would satisfy CWU's business interest.

## CONCLUSION

Disparate impact cases require actual proof of a disparate impact on "a protected group." Dr. Kucuk has failed to show that CWU's accreditation requirement has a disparate impact on the basis of national origin. As he cannot sustain his burden of proof and no material facts are in

1  actual dispute, CWU is entitled to summary judgment dismissal of Dr. Kucuk's disparate impact

2  claim. Accordingly, his claim and amended complaint are dismissed with prejudice.

3  **DATED** this 3rd day of December, 2018.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT - 17